Oral argument is in re marriage of Mueller, excuse me, in re marriage of Mueller. Sponsor. Good morning. Morning. Counsel. May I please record. My name is Brian Drew and I represent the respondent appellant for Lynn Mueller. Excuse me. This case comes before this court out of a judgment entered in Jackson County in the first judicial circuit from a divorce proceeding. That divorce proceeding began and ultimately was heard by the Honorable Charles Grace who is a judge of the circuit court of the first judicial circuit where the evidence was presented to him as to the financial issues outstanding in the underlying divorce case. Ultimately, I believe from the record it appears that Judge Grace was taken off of the dissolution docket that he was on and then ultimately Judge Fiello was then substituted in as the judge hearing dissolution cases in the first judicial circuit. So in our argument, I'm going to start at the end to as by way of my oral argument here is being our fourth section concerning the due process issue on that very issue of whether it was proper for Judge Fiello to make this ruling based on the evidence having been presented to a different judge. And in that case of Smith v. Freeman which was heard by the Supreme Court of Illinois lays out a foundation and in that case there was an issue of whether or not it was just per se you can't do it or if there could be a waiver. It's a due process right. It's a right. You can waive those rights if you so choose, but the court set out the manner in which that could be done. And when you look at the facts of this particular case, I think there's a large distinction to be had with that Supreme Court case and the finding therein and why this case is different. In that case, the attorneys came forward and requested of the new judge and there was a recusal based on a problem with discussions with parties and then the judge retired. In this case, Judge Grace is on the bench then and he's on the bench now. He wasn't unavailable or incapable of making a ruling. Simply there was just an administrative transfer of case loads between one judge to the other. And when we look at that date when the hearing was set, it was set for a case management conference by Judge Fiello. In the first judicial circuit, a case management conference is simply that, managing the case where we're at. And if you look at the docket entry, which I think is the most pertinent part of this, Judge Fiello's docket entry says that both parties appear by their attorneys of record. And the petitioner also appears in person, omitting that the respondent himself, Mr. Mueller, was appearing in person. And by the docket entry, which is what we have, he was not present at the hearing. Then the court advised the parties that the court's plan is that he was going to get the transcripts, have them ordered. He was going to then make a ruling based on the prior evidence presented to Judge Grace. He does know then neither party objects to that procedure. The problem with that is, in Illinois law, in order to give up a constitutional right, a due process right, there has to be a knowing, intelligent, and intentional waiver of a right. And when you look at the Smith and Freeman case, in that, there was a case where the attorneys requested it on behalf of the parties. They came forward with a stipulation and said, Judge, we're good with you doing this. We want this case ruled upon and done. It was the counsel that came forward to ask for it, which I think that gives some credibility to the fact that it was a knowing, intentional, and voluntary waiver of that due process right. In this case, the reverse happened. You have a circumstance where not only was the respondent not present, where he couldn't personally give that knowing, voluntary, and understanding waiver because he wasn't in the courtroom. Now, granted, he does have legal counsel present, but he wasn't there, and this is the party's due process right. We're not talking a circumstance where… Well, was there any impairment to either attorney objecting to that procedure? Well, and I think the reason there is is by the way the court did it. In that case, it was the court instructing the two counsels. The court advised… No, that's… Was there any impairment, whatever the court said, to counsel standing and saying, Your Honor, I object. I don't think this is the appropriate way to do it. These are the reasons why, or suggesting a modification of the court's approach. Is there anything in the record that impaired either counsel's ability to either object to the procedure or ask for a modification of the procedure? As far as the record and reviewing it, I don't believe there was any impediment to them standing and voicing an objection at that point. Okay. But as it relates to that, my argument to that point would be that because the manner in which the court did it and the respondent not being present, while counsel can do things on behalf of their client, in this case there was no written stipulation. There was no written request. There was not even a request by two counsel to do that. It was the court advising, and I guess I look at it like in a case where the person in authority says, Here's what I'm going to do. I'm advising you. Here's my plan. Now, granted, you could speak up, but in staying silent, you didn't necessarily acquiesce because you were told, Here's what's going to happen. You're being told, Here's my plan. Here's what I'm going to do. Now, no one voiced an objection at that point, but in this case, we're giving up a due process right, and I think that is the distinction that I'm making here is that when you've been told that, you haven't given up that right at that point in time. My client wasn't present to give that. In my 43 years of experience, I think lawyers are probably the most uninhibited group that I've ever dealt with, and proudly so. They had a full opportunity in open court to object, and I mean, I was objected to a number of times. There's nothing in the record that shows that there was an impairment for either counsel or both counsel together to object to the proposed procedure of the trial court successor trial judge, is there? No, there isn't. And for the last thing as it relates to that point, I would just simply assert that when you give up a due process right, I think there has to be an affirmative act on the parties, not merely an acquiescence in the circumstance because it is such a fundamental right that it requires more. And then when you look at which we'll roll into, I'll move on into the actual substance of the argument, and as it relates to that, we refer to an error by the court in the classification of marital and non-marital property, in addition that the court failed to consider the proper factors in the distribution of marital property, and also finally that the court should have considered maintenance and that the waiver that may be perceived in that circumstance by presenting facts to the court is improper and doesn't result in a just decision by not considering that. And when you look at it, the real crux of the matter is these four promissory notes by Mr. Mueller's mother that were provided. And when you look at those, the court in its ruling makes basically judgment calls as to the veracity of individuals and the manner in which they did that, and that's precisely what we talk about in this due process. This wasn't simply a financial circumstance where you say, well, the numbers are clear. I can look. I know what a house is worth. I know what a car is worth. I know what property is worth. I can see his retirement account, and I can divide those assets up. This was a case that required far more than that because you have a circumstance where there are presumptions at issue. Should they be applied? Should they not? And once you move past that, being obviously the petitioner, the appellee does, in fact, argue that, well, these are presumptively gifts because it's from a parent to a child, but actually it's from a grandparent to a grandchild on behalf of the two parents. So it is something unusual from the typical case law that we see there. And the court had to make a judgment call as to the truth and veracity of the mother of my client, the appellant, because in that case there were actual promissory notes written, and in that case there were school loans paid off for the child in common with the two parties. There were living expenses in a home that was salvaged for a grandchild under that circumstances, and the loans were actually paid off and promissory notes were entered. There were some factual determinations about when these promissory notes were done in relation to the separation of the parties, and that was some conflicting evidence, I would argue, by the reading of the record, some conflicting evidence as to when actually the petitioner left, which will be a very substantial fact in determining whether or not the promissory notes were done simply as a result of a divorce proceeding coming about and then them being brought up, as many times we see in these cases are done for the benefit of one party and the detriment of another. But in this case there was argument by the respondent appellant, Mr. Mueller, that in fact these were done prior to her leaving. The petitioner says, oh, no, I left, and I told him I was going to get divorced for a year. Those are factual circumstances of the believability of a witness that simply at times are near impossible to come off the page of a record. And that's precisely why in the progeny of cases that deals with this issue of the due process rights, why the court says it's not the way to do it and the reason it's not is because you have to make those circumstances. And when you look at the loans, and I'll talk to the factual circumstances of the loans and why the court should have determined that to be a marital debt subject to division between the parties and that they were proper notes and debts to the parties, is that in the case of Blasies or Blazes that the petitioner cites and holds says, well, this is the standard by which we should look at these promissory notes. The distinction between that case and the one we have at hand is simply that in that case the person against whom the loans were being held said, I had no knowledge of them, I wasn't there, I didn't write them, I didn't know what went on. In our case, the record is replete with facts that the petitioner in fact helped arrange the loans, the original loans that took place for the debts of the child in question. The loans were filled out in the name of Mr. Mueller. It was faxed from the workplace of the petitioner to send in for the daughter to get the loans. He was the promissory on it. And ultimately when she failed to pay it became his obligation, a marital obligation of the petitioner and the respondent. There was testimony presented by a respondent that in fact he and the petitioner had discussions where she said, look, you just need to go fix this. There's a loan, it's there, it's our daughter's. One, she's going to lose her house, then subsequently she owes these student loans, the interest rate is going to go up, go fix it. So he goes to his mother and he obtained loans from her. She gives them money, which he puts in a savings account and then doles out to the daughter for saving her house, keeping her daily expenses at issue and keeping her in good stead, which benefited the respondent or the petitioner as well because that was her daughter as well. This isn't a case where it solely benefited the respondent. And ultimately in the ruling of Judge Fiello he just ignored those issues and basically says I'm not validating these so you'll pay all these loans. And then when you look at the distribution, the actual distribution of debts and assets, that becomes a lopsided distribution under the circumstances between the parties because obviously the distribution isn't equal but it certainly is equitable as the circumstances under which we sit. And in viewing that and how it was done, certain accounts were awarded, debts were awarded between the parties and to the parties. And as you look at this, by not taking into consideration these loans that were outstanding to the respondent's mother that were valid commissary notes, it shifted and altered the exchange, what I believe out of the level of equitable and into an area of inequitable under the circumstances. Then as it relates to the distribution of the assets and property by the trial court, you look at the retirement account. The respondent was already retired at the time of the divorce. He was already receiving his pension. It was coming to him. Yes, under the case law, the state of Illinois and the statutes, it is an asset to be divided by the court. That is clear by the law and the case law. But there still is an equitable nature to the distribution of this. It isn't just a perfunctory, well, I'm going to divide it in half and we move forward. It's just it's an asset so I'm whacking it up and here we go. It has to be done equitably and we have to look at all those factors and what are the financial circumstances of the party. The petitioner had, with her income, at the end of the month, according to her finances, $600 left over. She was putting $100 towards her IRA. She was contributing towards Social Security. She was going to receive those things down the road. Those were things she was going to get, but in this case the court didn't consider any of that and the respondent was receiving only his $2,800 pension. There is some testimony of some odd jobs. He may have worked here and there, but he was already retired. That was the manner in which the court found these two individuals when they came before the court and said we want a dissolution of our marriage, divide up our assets. Then the court takes half of his pension and divides that as an asset of the parties and gives that to the petitioner, thereby placing her in a position of having, in essence, four times, nearly four times the income that the respondent has at that point in time. And then in that disparity and inequity of incomes, the court then does an inequitable distribution of property in favor of the petitioner as well again, which puts the respondent at even more disadvantage as being saddled with a tremendous amount of marital debt from which now he had $1,400 a month to pay, placing the respondent in the position of either liquidating assets that were awarded to him to pay debts or liquidating or seeking out additional employment when he was retired and not staying in the condition he was in during the marriage at a time when the court found him. And at that point in time, I believe, is when maintenance of the court determines that I'm going to divide up your retirement account and I'm just going to equally divide it between you because it is a marital asset that the court should have considered maintenance. Thank you. Thank you, Counsel. Counsel? Okay. Please, the court. Opposing counsel? I'm Winter Campanella and I represent the appellee petitioner, Connie Mueller. Just for simplification of argument, I will refer to the appellant as Glenn and the appellee as Connie.  With regard to the due process argument, it was waived. Not only, there wasn't just one time, as my opposing counsel argued, that Mr. Mueller had an opportunity to voice his objection. There was twice. First, there was a written order entered by Judge William Schwartz, who's the chief judge in Jackson County, that notified the parties, we're reassigning the case. If you object, file an objection within 14 days. And not being timid, I filed an objection on behalf of my client because my client objected to having to pay for the transcript. She did not object to another judge hearing deciding the issue, but she didn't want to be on the hook for the transcript. So I filed that and those things are in the record. Mr. Mueller, Glenn, did not file an objection. And then we had the case management conference approximately a month later. Mr. Mueller didn't show up. My client, Mrs. Mueller, did. And there was no party objected through their attorneys. And as the justices have already pointed out, us lawyers don't really have, we're not very timid about objecting. So it was waived. If you take a look at the case cited by opposing counsel, Smith v. Freeman, the Supreme Court case mentioned in their brief, there are actually three judges in that case. And the Supreme Court said if you waive that argument, it's waived, and you're bound by it. If you don't like how the new judge rules, tough. And that's the situation we're in here now because Glenn didn't like what Judge Field did and really he was never fully happy in a divorce case anyway. So that's why we're here hearing this argument. So then the next issue that was brought up by opposing counsel had to do with these promissory notes, which, very interesting. In order, as you read the statute, the court is to divide marital property, marital debts. In order for the court to divide a debt, it has to be a debt. That's where the analysis starts. It starts at whether or not these notes are considered a debt. And there are the two presumptions in play here. The presumption that something that occurred during the marriage is marital, be it incurring marital property or incurring marital debt. And then the presumption that exchanges between parent and child are considered gifts. Now, opposing counsel wants to try and say it was between grandparent and grandchild, but these notes have no... They're not, quote-unquote, enforceable. They're not enforceable at all, but if they are, it's not against the granddaughter. It's son and mother. So these two presumptions actually cancel each other out, which was argued in the appellant's brief that actually they would have to be proved by Connie by clear and convincing evidence that they were a gift. And that's not true. They cancel each other out, and that's in the marriage of Dyer, which was cited by my opposing colleague in his brief. Dyer says if there's the two presumptions, they cancel out, and then the court is to use a manifest way to the evidence. So under the manifest way to the evidence are these debts? No, they're not. They are, in fact, gifts. And the facts that kind of help with that is are these enforceable contracts? If you take a look at the record, E8 through 11, that's where these promissory notes are located, the main terms of the contracts are there's a loan of some kind, and then it says interest due yearly, principal due when available. Well, when's the principal going to be available? A key term of the contract is when is it supposed to be paid? If that term is not in the note, it's not an enforceable debt. And if it's not an enforceable debt, then it is a gift. If you take a look at Academy of Chicago Publishers v. Sheever, it's 144 Illinois 2nd 24. I cited it in my brief. It's an Illinois Supreme Court case that stands for the proposition that all material terms of the contract have to be present in order to be an enforceable debt.  then what is it? It's a gift. And the trial court's determination of that is that it should stand. One thing I wanted to point out is one misstatement by my colleague, which I don't fault him because he wasn't the trial attorney, and as we all know, being the trial attorney, you're saturated with the facts of the case. The trial court in its judgment didn't focus on when Connie said she left Glenn or when Glenn said that he didn't know when she was going to leave. Of the four promissory notes, there's one dated October 2010, one dated February 23rd, 2015, and then two in March, one March 4th of 15 and one March 18th of 15. The court focused on the fact that the first three, the one from 2010, the one from February 15th, and the first one from March of 15th were all signed at the same time, so they were all signed at the beginning of March, and the court focused on the fact that March is when Connie filed for divorce, not when she left. That's when she filed for divorce. The petition for dissolution of marriage was filed March 16, 2015, and a reasonable person could surmise from that that she left before that date and that she left the same month she filed for the dissolution of marriage. Opposing counsel attacks the Blases case, it actually is pretty ongoing. The amount of money is different, I'll give you that. The husband's mother, Blases, never requested payment, and neither did Glenn's mother, and Glenn hadn't been invited by the terms of the contract. The 2010 contract should have had interest payments in October of 11, 12, and 14, none of which had been made. The interest payments for the February note hadn't been made. The payments for the March note, March 4th note, hadn't been paid. The only payments that had been made were on the March 18, 2015 note when Glenn supposedly borrowed money from his mother to help pay his attorney's fees. That was the only note that had payment. And that weighed in on Judge Field's decision as well. And if you look at all of those factors under the Manifest Weight of the Evidence, which I know this Court knows what Manifest Weight of the Evidence is, but it's where the opposite conclusion would be clearly apparent. It is not clearly apparent that these notes are in fact debts and should have been divided. So the trial court's decision in that regard should stand. Now, talking about Mr. Mueller's pension, if you look at the division of debts in the record, the assets awarded to Glenn, about $230,000. The debts awarded to Glenn, about $99,000. He has equity of $130,000 awarded to him in the judgment. Connie, on the other hand, has assets of $159,000 approximately, debts of $37,000 approximately, and assets of $122,000. She came up $8,000 short on this, yet Glenn is arguing that he's entitled to even more. He's entitled to all of his pension. And why is he entitled to all of his pension? Because he voluntarily retired and works side jobs? Well, let's take a look at what the evidence said about Connie. And this evidence was not in dispute. It wasn't a matter of there was conflicting testimony. The parties were married February 6, 1982. Connie started working part-time in 96, and one of the parties had two minor children. Connie started working part-time in 96, did not start working full-time until 2006. She was stunted in paying into a retirement because of her duty to her family, working part-time to take care of the children. So because of that, it's equitable to divide a pension of the husband of Glenn because of the wife's obligation that she took on to help raise the family. So it seems equitable to divide that. The brief of the housing council mentioned that Connie testified she did whatever she wanted to do with her paychecks, and Glenn was paying all of the household expenses. Actually, the testimony says that from Connie was that she did what she wanted to with her bonus checks, which were once a month, and Glenn did what he wanted with his side job money. I find it adventurous that a housing council argues that in their brief that Glenn was the one paying all of the bills, but yet in the same few pages argues that Glenn needs maintenance. As you know, maintenance is to rehabilitate, it's designed to rehabilitate a dependent spouse. Well, Glenn can't be the one paying all the bills and be a dependent spouse at the same time. With regard to maintenance, maintenance was waived. It was clearly waived. He did not file a pleading requesting maintenance. If you look at the petition for dissolution of marriage or any county petition, there was no pleading requesting maintenance. Glenn didn't mention it at the trial court level, and the parties that entered prior to trial, there had been negotiations back and forth, and the parties had entered into a stipulation. They stipulated as to facts at issue. They stipulated as to values in certain division of marital property. They stipulated to these things. They also stipulated to what issues needed to be decided, and in that list, maintenance isn't mentioned because both parties had waived it at that point. Now, Glenn wants to try and argue there's a difference in income. In order for this court to overturn any award of maintenance, there has to be an abuse of discretion. Treatment has to be arbitrarily done. If you read Judge Spiello's analysis of the pension and Glenn's income, it is as far from arbitrary as I can get. He analyzed how long Glenn would be alive. He analyzed the value of the pension. He took into consideration that Glenn voluntarily retired, which there was no evidence that Glenn had any health issues, and actually his side jobs were farming. That involves physical labor. There was no evidence, and Judge Spiello hit the nail on the head. There was no evidence that he couldn't go get a full-time job and have half his pension, his side jobs, and full-time employment. Judge Spiello analyzed this in a very un-arbitrary way, and as such, it should not be disturbed. Your Honor, we would ask that the court affirm, the trial court, in summary, that the due process was waived, and not just once, but twice, that the promissory notes, in fact, are gifts. They are not notes. I put in quotations. They are not debts. They were gifts, and it's to be used as a manifest rate of the evidence standard in analyzing that. With regard to the pension, the statute does say equitable. It doesn't say equal. But if you take a look at the division of the assets, how Lynn ends up with $8,000 more in assets on a long-term marriage, and how my client didn't work full-time until 2006 because of her duty to her family, it is equitable to give her half of the pension, which is what Judge Spiello did. And as you know, the issue on the notes in the division of the assets had to be manifest way, which means the opposite conclusion is clearly apparent. And as I stand here before you today, the opposite conclusion is not clearly apparent. And, in fact, the conclusion reached by Judge Spiello is the one that is clearly apparent, and we would ask the trial court to affirm. Thank you, Justices, for your time. Thank you. Thank you, Counsel. Counsel? As to the issue as to the division, and in Counsel's argument, Counsel refers to the issue of, well, he throughout the marriage was the breadwinner, but like in many relationships or marriages that last over the course of a lifetime, roles change. And while he was the primary breadwinner at the beginning of the marriage, he wasn't at the end. And at the end, she earned more income than he earned. He had a pension, and that was his contribution at that point in time of providing to that. So the court is stuck with taking people as they are found. And as they were found at the time, Mrs. Bieler was the person who was working and providing the income at the time. And I think partially here in viewing it, you say, well, I mean, he can go to work. I mean, I've had a lot of cases, and I've heard people say things, how offensive it is to say to someone who is the homemaker at the time or is the person having the other individual in a marriage being the worker, and say to them, well, at this point in time, I mean, I know that's where you're at and where everybody agreed you would be, but you just need to go work now. And I think in looking at that and dividing the assets, that's where he was at the time. Mr. Bieler was in a position of being a person who was retired. He was at home while she was out working, developing her career, continuing to add to her 401K through her lifetime, which he now could no longer do. His benefits under his pension were set, finalized, and done. Granted, he retired at 53, but those are fixed. He can't turn around and go back and reopen it up and then start adding more. She's going to add over a lifetime of working over the next 10 to 15, 20 years up to her retirement of additional time. She's going to get those benefits that he doesn't get. And so respectfully, I say that the court inequitably divided the assets of the parties because when you look at the actual debts attached to the assets allotted to husband, he was left with income wholly insufficient to pay it, and he's going to have to liquidate assets to pay daily expenses, which I believe expressly should not happen under the case law of the State of Illinois and the reason why this is inequitable division under the circumstances. So respectfully, we ask the court to overturn the findings of the court for all of the reasons set forth in our view. Thank you. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take the case under advisement and issue a ruling in due course.